# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 17, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0296-WC

CRAIG PAPINEAU          APPELLANT

V.

ON APPEAL FROM COURT OF APPEALS
NO. 2019-CA-0613
WORKERS' COMPENSATION BOARD
NO. WC-18-00201

TRANS ASH INC.;          APPELLEES
HONORABLE CHRISTINA D. HAJJAR,
ADMINISTRATIVE LAW JUDGE;
AND KENTUCKY WORKERS'
COMPENSATION BOARD

## MEMORANDUM OPINION OF THE COURT

### REVERSING

Craig Papineau (Mr. Papineau) appeals a decision of the Court of Appeals that reversed the Workers' Compensation Board's (Board) and Administrative Law Judge's (ALJ) rulings in his favor. The sole issue to be addressed in this case is whether the ALJ's opinion and award of workers' compensation benefits to Mr. Papineau was supported by substantial evidence. After review, we reverse the Court of Appeals and reinstate the ALJ's opinion and award.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute. As of the writing of this opinion, Mr. Papineau is sixty-six years old with a general education degree. The entirety of Mr. Papineau's thirty-five-year career was spent working as a heavy equipment operator, primarily in the coal mining industry.

From 1981 to 1995 Mr. Papineau worked as a dragline[1] operator for Smith Coal. From 1995 to 1998 he worked as a dragline operator for Black Diamond Mines. From 1998 to 2013 he worked for himself as a heavy equipment operator. From June 2013 to July 2014 he worked for GMS as a heavy equipment operator. Beginning sometime in 2014 until February 2015 he worked for Patriot Coal as a heavy equipment operator and also maintained a belt line that was nine miles long. His work maintaining the belt line differed from his work operating heavy machinery in that it required "observation of [the belt line], repairing anything that breaks, or anything like that." Subsequently, from March 2015 until October 2015 he worked for Kiewit as a heavy equipment operator. Finally, he worked for the employer in this case, Trans Ash, from October 26, 2015, to November 20, 2015, and then from February 15, 2016, to November 1, 2016. He did not work for any other companies between November 20, 2015, and February 15, 2016. He has not worked anywhere since he ceased working for Trans Ash on November 1, 2016, and he considers himself retired.

On February 3, 2018, Mr. Papineau filed an application for resolution of a work-related injury claim (Form 101). In his Form 101, he alleged cumulative trauma to his lower back and bilateral shoulders,[2] and that the

---

[1] A dragline is "a large bucket excavator that is controlled by a system of pulleys, chains, and ropes that hoist the bucket. Dragline buckets are enormous machines that can move many tons of dirt, rock, and overburden." https://americanmineservices.com/largest-dragline-in-the-world/ (last accessed May 13, 2021).

[2] Mr. Papineau also alleged cumulative trauma injuries to his bilateral knees, ankles, and feet. However, he agreed to drop those claims during the formal hearing before the ALJ, as no impairment rating was assigned for them. Mr. Papineau also

2

date of the injury was November 1, 2016. As an attachment to his Form 101, Mr. Papineau filed a medical questionnaire filled out by Dr. James Rushing. Dr. Rushing examined Mr. Papineau on August 2, 2017. Dr. Rushing opined that Mr. Papineau's medical issues with his shoulders and back were caused either wholly or in part by his job activities, and that continuation of his job duties would continue to cause adverse health consequences.

The following month, Mr. Papineau filed a more thorough medical report from Dr. Stephen Autry. Dr. Autry had examined Mr. Papineau on March 8 at the request of Mr. Papineau's attorney. It is undisputed that Dr. Autry misstated the timeline of Mr. Papineau's employment with Trans Ash in his medical report, which states: "[i]n 2014, after being laid off at Patriot Coal, he began working for Trans Ash and continued to work through April of 2017, when he retired." As previously discussed, Mr. Papineau worked for Trans Ash from October 26, 2015 to November 20, 2015, and then from February 15, 2016 to November 1, 2016.

In addition, and of particular relevance to this case, Dr. Autry detailed Mr. Papineau's job duties in three different places in the report. In the "Plaintiff History" section of the report, Dr. Autry stated:

> [t]he plaintiff ... has worked thirty five years in the coal industry ... During the course of his employment, he sustained significant impact while operating equipment over uneven surfaces. He had to operate levers and controls, climb up and down off of equipment, perform maintenance and do lifting,

filed an application for resolution of a work-related hearing loss claim on the same day he filed his Form 101. The ALJ ultimately only awarded medical benefits for the hearing loss claim, as no impairment rating was assigned for it either. Trans Ash does not appear to challenge that award.

3

bending and stooping activities during the course of his employment.

Similarly, in the "Causation" section of the report, Dr. Autry noted that "[t]he plaintiff's job required significant operation of heavy equipment with impact loading, climbing, operating and working in difficult positions, creating significant stress loads on both shoulders and lower back." Finally, in the "Restrictions" section of his report, Dr. Autry recounted that Mr. Papineau "described [the] physical requirements of the type of work performed with last employer and the injury history. The job description included prolonged standing, walking, climbing, lifting, reaching, pushing, pulling, bending, stooping, crouching and overhead lifting."

Dr. Autry diagnosed Mr. Papineau with, inter alia, "[a]ggravation of lumbar spondylosis,"[3] "[r]otator cuff tendinosis[4] and impingement,[5] right shoulder," and "[r]otator cuff tendinosis and impingement, left shoulder." Dr. Autry explained in the "Causation" and "Explanation of Causal Relationship" sections of his report that

---

[3] "Spondylosis is age-related change of the bones (vertebrae) and discs of the spine. These changes are often called degenerative disc disease and osteoarthritis." https://www.uofmhealth.org/health-library/abr8401 (last accessed May 12, 2021).

[4] "Rotator cuff tendonitis is an inflammation of a group of muscles in the shoulder together with an inflammation of the lubrication mechanism called the BURSA." https://my.clevelandclinic.org/health/diseases/17449-rotator-cuff-tendonitis (last accessed May 12, 2021).

[5] "Shoulder impingement syndrome occurs when the tendons of the rotator cuff and the subacromial bursa are pinched in the narrow space beneath the acromion. This causes the tendons and bursa to become inflamed and swollen. This pinching is worse when the arm is raised away from the side of the body. Impingement may develop over time as a result of a minor injury, or as a result of repetitive motions that lead to inflammation in the bursa." https://www.thesteadmanclinic.com/patient-education/shoulder/rotator-cuff-impingement (last accessed May 12, 2021).

4

[r]ecurrent micro trauma may occur throughout the musculoskeletal system including bones, ligament, tendons, muscles and vertebral discs. Cyclic loading of these tissues may cause structural fatigue and gradual degradation of these structures. The symptomatic appearance of these destructive processes may take years to emerge. Individuals engaged in frequent heavy lifting, working in positions requiring highly leveraged or repetitive activities, or substantial cyclic impact loading are candidates for symptomatic injuries and impairment due to cumulative trauma.

[ ... ]

[Mr. Papineau] has worked in mining for over thirty-five years. Over this period of time, he had sustained injuries, which have been detailed above. This listing is not necessarily complete. [Mr. Papineau] has experienced work related pain in multiple areas of his body including his back [and] shoulders. These injuries are consequences of his many years in mining. Pain and functional limitations may be the combined result of incident and cumulative trauma.

[ ... ]

The lumbar spine is subject to axial (compressive), bending, and torsional (twisting) loads during work activities. These stresses subject soft tissue and bone to cyclic loading and fatigue. These traumas may be initially asymptomatic but, over time, can accumulate and make a previously asymptomatic condition symptomatic. In the case of [Mr. Papineau], harmful change occurred due to recurrent stress loading to the disc, ligament, and facet anatomy sustained during the course of performing the activities required in his job description.

[ ... ]

The rotator cuff is a group of connected muscle insertions (tendons) that, like the clutch of a car, stabilize and engage the humerus (arm) and glenoid (shoulder blade). There is substantial leverage placed on this structure during lifting, pulling, and jerking particularly when the arm is in awkward positions. Recurrent injuries can tear the insertion (attachment) of these tendons. Microscopic tears can, with recurrent stress loading, progress to a complete tear.

[ ... ]

5

**This, taken in conjunction with the other problems detailed above, represent (sic) conditions in which the symptoms have been asymptomatic, dormant, and non-disabling but have been aroused into a disabling condition by the plaintiff's latest employment**.[6]

Dr. Autry assigned Mr. Papineau a 23% whole person impairment rating and opined that he had reached maximum medical improvement as of the date of the examination. Based on his diagnoses, Dr. Autry did not believe Mr. Papineau had the physical capacity to return to work as a heavy equipment operator, and recommended several physical restrictions. Dr. Autry did not believe that Mr. Papineau had an active impairment prior to the manifestation of his cumulative trauma injuries.

Mr. Papineau later testified[7] regarding his claim. He explained that a typical cab for the vehicles he worked in for Trans Ash was about six to seven feet off of the ground. Therefore, in order to enter the vehicle, he would have to pull himself up to the cab by using steps and handles on the side of vehicle. He estimated that he would enter and exit the vehicle between two and four times each day. His workday mainly involved sitting in the cab of the vehicle and pulling levers and pushing pedals inside the vehicle. Mr. Papineau explained what he believed the cause of his cumulative injuries to be:

> **Q:** Mr. Papineau, what do you think about your job with Trans Ash injured your low back?
>
> **A:** Vibration. You know when you're driving along in a car and you hit a pothole? Same thing on a heavy piece of equipment, like a bulldozer or a bobcat. You're going along there and the terrain

---

[6] (Emphasis added).

[7] Discussion of his testimony is drawn from both Mr. Papineau's deposition, which was taken on July 13, 2018, and the formal hearing before the ALJ, which occurred on August 21, 2018.

changes or you run over something there's a jar, or maybe back into something, there's a jar.  You know, that's what I'm saying.

[ … ]

**Q:** What do you think about your work with Trans Ash injured your shoulders?

**A:** Climbing from the ground up on the machine and you get up there and you twist around on a track and open a door and maybe go around, tie the door open.  And you do that three or four times a day.  It contributed to it.

Mr. Papineau disagreed with Trans Ash's attorney's characterization of his job as "light duty."  He instead felt that it was of moderate intensity, citing the extreme vibrations and jarring and also noted that, for example, on "a slope with, say, three to one elevation, you know, you'd be leaning over in the seat pretty bad one way or the other."  He agreed that his work for Trans Ash involved no heavy lifting or bending and stooping and that he did not personally perform maintenance for the vehicles in which he worked.

Mr. Papineau stated that he had never been injured at work at any time during his thirty-five-year career.  He further testified that he could not pinpoint a specific incident that made him decide to file a workers' compensation claim.  Rather, the pain in his lower back and shoulders developed slowly over time, and he decided to file a workers' compensation claim after he was denied Social Security Disability benefits.  He stated that his injuries do not interfere with his everyday life, though mowing his lawn does sometimes aggravate his existing pain.  He did not believe he could return to work as a heavy equipment operator due to the pain in his back and shoulders.

7

The medical questionnaire by Dr. Rushing, and the medical report by Dr. Autry were the only medical evidence submitted by Mr. Papineau. Trans Ash did not proffer any medical evidence.

Based on the evidence before her, the ALJ found that Mr. Papineau

> [s]ustained work-related … cumulative trauma to his low back and shoulders and that he is entitled to permanent partial disability benefits based upon the 23% impairment rating, and the 3.6 multiplier, due to his inability to return to the work he was performing at the time of the injury. He is also entitled to future medical expenses for his low back [and] shoulders.

The "Summary of Evidence" section of the ALJ's opinion and award reflects that she considered the deposition and live testimony of Mr. Papineau as well as Mr. Papineau's timesheets from his tenure with Trans Ash.[8] She also considered Dr. Rushing's medical questionnaire, though seemingly to a much lesser extent than Dr. Autry's report. The ALJ's discussion of the evidence from Dr. Rushing in its entirety was:

> Dr. Rushing performed a chiropractic/orthopedic examination on August 2, 2017. Dr. Rushing diagnosed lumbar bulging disc; [and] degenerative joint disease of the … shoulders. Dr. Rushing opined that Papineau's medical issues to his shoulders [and] back … were caused, either wholly or in part, by his job activities. He believed that continuation of Papineau's job duties would continue to have adverse health consequences.

In contrast, the ALJ discussed Dr. Autry's report at length. Of note, she recounted the following:

> [Dr. Autry] stated that Papineau sustained impact while operating equipment over uneven surfaces. He had to operate levers and controls and climb up and down off of equipment. He performed

---

[8] While working for Trans Ash, Mr. Papineau completed daily timesheets. Each timesheet asked whether the employee had been injured that day. Mr. Papineau never indicated that he had been injured on his timesheets.

maintenance and did lifting, bending and stooping activities during the course of his employment. Dr. Autry noted that his right shoulder has developed significant problems over a four-year period from jerking, pushing, and pulling. He had to run a drag line, which (sic) significant stress load on either shoulder.

[ … ]

Dr. Autry diagnosed … aggravation of lumbar spondylosis; rotator cuff tendinosis and impingement, right and left shoulders[.] Dr. Autry opined that Papineau's injury was caused by his work injury (sic). Dr. Autry explained that Papineau's history and job description correlate with the specific diagnoses. He stated that Papineau's job required significant operation of heavy equipment with impact loading, climbing, operating and working in difficult positions, creating significant stress loads on both shoulders and the lower back.

Dr. Autry further explained that Papineau had experienced work-related pain in multiple areas of his body including his back [and] shoulders[.] Dr. Autry opined that those injuries were consequences of his many years in mining; and that the pain and functional limitations may be the combined result of incident and cumulative trauma.

Dr. Autry stated that there is substantial leverage placed on the rotator cuff, particularly when the arm in in an awkward position, and that recurrent injuries can tear the insert of these tendons. Microscopic tears can, with recurrent stress loading, progress to a complete tear. He also described that the lumbar spine is subject to axial (compressive), bending and torsional (twisting) loads during work activities.

Dr. Autry utilized that (sic) *AMA Guides* to the Evaluation of Permanent Impairment, and assessed a 23% whole person impairment, DRE Category I; aggravation of lumbar spondylosis with significant pain (2%); and rotator cuff tendinosis and impingement, right shoulder (10%) and left shoulder (12%). Dr. Autry opined that Papineau did not have an active impairment prior to this injury; and that Papineau's condition was deemed static and at maximum medical improvement as of the date of this exam. Dr. Autry finally opined that Papineau did not retain the physical capacity to return to the type of work performed at the time of the injury. Dr. Autry recommended restrictions including avoiding tasks involving lifting, bending, stooping, pushing, pulling, climbing, and overhead lifting, and no lifting more than 20 pounds.

In the "Causation" portion of her opinion and award, the ALJ found that Mr. Papineau met his burden of proving that he sustained work-related cumulative trauma injuries while working at Trans Ash. She reasoned:

> [w]here an individual continues to perform the same repetitive activity after a gradual injury becomes manifest, additional incidents of workplace trauma may well cause additional harmful changes. In other words, the individual may well sustain subsequent gradual injuries. *Special Fund v. Clark*, 998 S.W.2d 487 (Ky. 1999). The Kentucky Supreme Court recently addressed which employer bears the responsibility of compensating an injured worker for an alleged cumulative trauma injury:
>
>> In hearing loss and occupational disease claims— which are quite similar in nature to cumulative trauma because they occur gradually over time—the employer at the time of the last injurious or hazardous exposure is liable. The employee is entitled to the same amount of compensation whether he worked for one employer or many. An employee who sustains a harmful change in his human organism due to cumulative trauma over many years working for the same employer is entitled to compensation to the full extent of his resultant disability.
>
> *Hale v. CDR Operations, Inc.*, 474 S.W.3d 129 (Ky. 2015).
>
> **Defendant argues that Dr. Autry's report is insufficient to support a claim for cumulative trauma, in part, because Dr. Autry was mistaken concerning the amount of time he worked at Trans Ash, and when his employment ended. Defendant argues that such mistake is critical given that he never provided a manifestation date for the injury. However, this ALJ finds whether he worked at Trans Ash for 9 months or three years is irrelevant, because Dr. Autry opined that Papineau's employment at Trans Ash as an equipment operator caused cumulative trauma, and Trans Ash was Papineau's last employer**. Defendant failed to file any medical evidence disputing Dr. Autry's report. Further, it has been definitively established by Papineau's testimony that he last worked for Defendant in November 2016, and that Trans Ash was his last employer. Although [Papineau] had symptoms in his low back and shoulders, and even underwent some treatment before working for Trans Ash, there is no evidence that his injury manifested prior to his employment with Trans Ash, or that his

10

conditions were active when he started working for Trans Ash. Papineau worked at Trans Ash with no restrictions and continued to do so until he retired in November 2016.[9]

The ALJ then addressed Trans Ash's concern regarding Dr. Autry's failure to

provide a date of manifestation for Mr. Papineau's cumulative injuries:

> [i]n *Randall Co./Randall Div. of Textron, Inc. v. Pendland*, 770 S.W.2d 687, 688 (Ky. App. 1989), the Kentucky Court of Appeals adopted a rule of discovery with regard to cumulative trauma injury holding the date of injury is "when the disabling reality of the injuries becomes manifest."  In *Special Fund v. Clark*, 998 S.W.2d 487, 490 (Ky. 1999), the Kentucky Supreme Court defined "manifestation" in a cumulative trauma injury claim as follows:
>
>> In view of the foregoing, we construed the meaning of the term 'manifestation of disability,' as it was used in *Randall Co v. Pendland*, as referring to physically and/or occupationally disabling symptoms which lead the worker to discover that a work-related injury has been sustained.
>
> In other words, a cumulative trauma injury manifests when "a worker discovers that a physically disabling injury had been sustained [and] knows it is caused by work."  *Alcan Foil Products v. Huff*, 2 S.W.3d 96, 101 (Ky. 1999).  A worker is not required to self-diagnose the cause of a harmful change as being a work-related cumulative trauma injury.  *See American Printing House for the Blind v. Brown*, 142 S.W.3d 145 (Ky. 2004).  Rather, a physician must diagnose the condition and its work-relatedness.  Although Defendant asserts that Papineau had complaints of pain and sought treatment before his work at Trans Ash, Defendant has pointed to no evidence indicating that any doctor ever related his complaints to cumulative trauma until he was examined by Dr. Rushing on August 2, 2017.  This ALJ also finds that the timesheets Papineau submitted indicating that he had no injuries each day he worked for Trans Ash is not determinative as to whether he had a cumulative trauma injury, as he is not required to self-diagnose his injuries.  Since Dr. Autry related the cumulative trauma to his last employment with Trans Ash, and Plaintiff's last date of employment was November 1, 2016, this ALJ finds that the injury date is November 1, 2016.

---

[9] (Emphasis added).

11

The ALJ then recounted her reasoning for awarding permanent partial disability benefits:

> [t]his ALJ finds that Defendant has produced no medical evidence to dispute Dr. Autry's report, who found that Papineau has a 23% impairment due to work-related cumulative trauma. This ALJ is also unconvinced by Defendant's arguments that Papineau has failed to meet his burden of proving a work injury and resulting impairment by filing Dr. Autry's report. Thus, pursuant to the unrebutted report of Dr. Autry, Plaintiff has a 23% impairment rating.
>
> Further, this ALJ finds Papineau's testimony convincing that due to his shoulder pain and low back pain, he would not be able to return to the work he was performing at the time of the injury, and he is entitled to the 3.6 multiplier (the .6 due to his age at the time of the injury)…Although he can perform his daily activities and fish, this does not equate to a finding that he could return to the work he was performing as an equipment operator. He stated that he did have some pain while trying to mow the grass, and he stated unequivocally that he did not believe he could return to his prior work. Further, Dr. Autry recommended restrictions and specifically opined that he could not perform his work activities as an equipment operator. There is no medical evidence disputing Dr. Autry's report.
>
> **Although Defendant argues that Dr. Autry had an incorrect description of his job duties, and points to [the] fact that he described working as a dragline operator, this ALJ finds that Dr. Autry was describing all of Papineau's prior jobs in the past that would have contributed to his cumulative trauma**. **Further, Dr. Autry stated that Papineau's job required significant operation of heavy equipment with impact loading, climbing, operating and working in difficult positions, creating significant stress loads on both shoulders and the lower back. This ALJ finds that Dr. Autry's opinion is consistent with Papineau's testimony**. Papineau stated that he felt the vibration of the heavy equipment caused his low back injuries. He testified that climbing from the ground up on the machine and twisting to open/close the cab door three to four times per day caused his shoulder injury. Papineau denied that he considered operating heavy machinery as light duty. Further, Papineau explained that it would [be] moderate in his opinion, because of the jarring and bouncing, due to the terrain. Defendant argues that Papineau admitted that operating heavy equipment was like driving a car. However, he admitted only that it was similar in the sense that the

12

controls were where he could reach them from a sitting position. This was not an admission that his job was as easy as driving a car on a paved road. Thus, this ALJ finds that Dr. Autry did have an adequate understanding of Papineau's job, and therefore, his opinion concerning causation and whether Papineau can return to work is credible.[10]

Following the ALJ's ruling, Trans Ash filed a petition for reconsideration (PFR). The ALJ denied the PFR based on Trans Ash's failure to raise any new errors appearing on the face of her opinion and award.

Trans Ash then appealed to the Board. Trans Ash argued, as it now does before this Court, that the ALJ's ruling was not based upon substantial evidence for two reasons: (1) because Dr. Autry provided an inaccurate description of the length of time that Mr. Papineau worked for Trans Ash; and (2) because Dr. Autry provided an inaccurate description of the physical requirements of Mr. Papineau's job duties while working for Trans Ash.

In a thorough opinion, the Board unanimously upheld the ALJ. Regarding Dr. Autry's inaccurate description of the length of time that Mr. Papineau worked for Trans Ash, the Board agreed with the ALJ's determination that this Court's recent holding in *Hale v. CDR Operations, Inc., supra,* rendered the error harmless:

> [i]n his March 8, 2018, report, Dr. Autry stated that, in 2014, after Papineau was laid off at Patriot Coal, he began working for Trans Ash and continued working through April 2017 when he retired. That statement is not correct, as Papineau testified he only worked for Trans Ash from October 25, 2015, through November 20, 2015, and from February 15, 2016, through November 2016. His work history reveals he was last employed by Trans Ash on November 1, 2016. As noted by the ALJ, the fact Papineau worked nine months is irrelevant. If the ALJ determines, which she did, that the symptoms in Papineau's lower back and shoulders worsened

---

[10] (Emphasis added).

13

during his employment with Trans Ash causing the injuries to manifest, then Trans Ash is the employer at risk and bears the entire liability for the cumulative trauma injuries.

[ … ]

Although Dr. Autry had a mistaken understanding of the length of Papineau's employment with Trans Ash, he clearly attributed Papineau's cumulative trauma injuries to his lower back and shoulder to his work activities with Trans Ash. More importantly, his report, in two different sections, demonstrates he possessed a correct understanding of Papineau's job duties with Trans Ash. Pursuant to *Hale*, that is sufficient to impose the entire liability for the cumulative trauma injuries upon Trans Ash.

The Board also rejected Trans Ash's argument that Dr. Autry lacked an accurate understanding of Mr. Papineau's job duties while working for Trans Ash:

> The record does not demonstrate, as argued by Trans Ash, Dr. Autry misunderstood Papineau's job duties. In making that argument, Trans Ash notes Dr. Autry stated as follows:
>
> > 1. The plaintiff described the physical requirements of the type of work performed at the time of the injury as follows:
> >
> > The plaintiff described physical requirements of the type of work performed with last employer and **injury history**. The job description included prolonged standing, walking, climbing, lifting, reaching, pushing, pulling, bending, stooping, crouching, and overhead lifting. (emphasis added).
>
> The ALJ concluded that, in making his statement, Dr. Autry was describing all of Papineau's prior jobs which contributed to the cumulative trauma injuries to his lower back and shoulders. We believe this is a reasonable interpretation of Dr. Autry's statement set forth above.
>
> Significantly, Dr. Autry's report, in two different sections, demonstrates he had an accurate understanding of Papineau's job duties with Trans Ash…The history Dr. Autry set forth and his description of Papineau's job duties contained in the "Causation" section are consistent with Papineau's testimony concerning his job duties with Trans Ash. Thus, we find no merit in Trans Ash's

14

assertion Dr. Autry misunderstood Papineau's job duties. The opinions expressed by Dr. Autry under the "Causation" and "Explanation of Causal Relationship" sections in his report constitute substantial evidence supporting the ALJ's determination Papineau sustained cumulative trauma injuries to his lower back and shoulders manifesting during his employment with Trans Ash.

Subsequent to the Board's ruling, Trans Ash appealed to the Court of Appeals. A divided Court of Appeals reversed and vacated the ALJ's opinion and award.[11] The entirety of the majority's analysis consisted of the following:

> [i]n this case, the ALJ found that Papineau suffered cumulative trauma injuries to his lumbar spine and shoulders that became manifest on November 1, 2016. To support that finding, it is clear that the ALJ relied upon the expert opinion of Dr. Autry. In his report, Dr. Autry opined that Papineau's work history in the mines caused Papineau to sustain cumulative trauma injuries that became manifest "by the plaintiff's latest employment." Dr. Autry did not specify a date that Papineau's cumulative trauma injuries manifested. The omission is significant because Dr. Autry erroneously believed that Papineau worked for Trans Ash for three years, beginning in 2014. However, Papineau only worked for Trans Ash for nine days in October – November 2015, and for approximately nine months beginning in February 2016. Dr. Autry further stated in his report that Papineau continued his employment at Trans Ash through April of 2017, which is totally in error.
>
> Our Supreme Court has held that "[w]hen a physician's opinion is based on a history that is 'substantially inaccurate or largely incomplete,' that opinion 'cannot constitute substantial evidence.'" *Eddie's Service Center v. Thomas*, 503 S.W.3d 881, 887 (Ky. 2016) (quoting *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839, 842 (Ky. 2004)). As set forth above, Dr. Autry's opinion was based upon a substantially inaccurate work history – that Papineau was employed by Trans Ash for three years. This alone raises serious doubt as to whether Dr. Autry properly evaluated Papineau's job duties at Trans Ash to establish an accurate work history or a cumulative injury. Given the inaccuracy of the work history set out in the expert opinion exclusively relied upon by the ALJ to establish the cumulative injury, we conclude that Dr. Autry's opinion cannot constitute substantial evidence to support the

---

[11] *Trans Ash, Inc. v. Papineau*, 2019-CA-000613-WC, 2020 WL 3027313 (Ky. App. June 5, 2020) (Clayton, C.J., dissenting).

15

ALJ's findings. We, thus, vacate the Board's Opinion affirming the ALJ and remand for the ALJ to reconsider Papineau's claims of cumulative trauma injuries.

We view any remaining contentions of error as moot or without merit.[12]

In her dissenting opinion, Chief Judge Clayton argued that the Board properly upheld the ALJ's award based upon the holding in *Hale, supra*.[13] She discussed *Hale* at length, including its factual similarities to the case at bar.[14] She then concluded her dissent by contending that

> the ALJ determined that Dr. Autry's report was sufficient evidence that Papineau's injury was caused by a work injury, and no contrary medical evidence was produced. Therefore, even if Dr. Autry was incorrect as to the injury's manifestation date, such mistake was harmless error. The workers' compensation statutes, as currently drafted, dictate that the last employer is liable and that apportionment amongst the various employers is not allowable. Trans Ash, Inc., as the last employer, is liable. Therefore, I would affirm the decision of the Workers' Compensation Board.[15]

Mr. Papineau now appeals the Court of Appeals' ruling to this Court. Additional facts are discussed below as necessary.

## II. ANALYSIS

Mr. Papineau met his burden of proof before the ALJ to show that he suffered work-related cumulative trauma injuries. Accordingly, in order to prevail on appeal, Trans Ash must demonstrate that the ALJ's decision was not

---

[12] *Id.* at *2-*3 (internal footnotes omitted).

[13] *Id.* at *3.

[14] *Id.*

[15] *Id.*

16

supported by substantial evidence.[16]  "Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[17]  Further, the role of this Court in workers' compensation cases are limited to "[addressing] new or novel questions of statutory construction, or [reconsidering] precedent when such appears necessary, or [reviewing] a question of constitutional magnitude."[18]  As such, the fact-finding role of the ALJ is entitled to a great deal of deference.  "The ALJ has the sole discretion to determine the quality, character, and substance of the evidence and may reject any testimony and believe or disbelieve various parts of the evidence regardless of whether it comes from the same witness or the same party's total proof."[19]  This Court cannot substitute its judgment for that of the ALJ's as to the weight of the evidence and questions of fact, and "[e]vidence that would have supported but not compelled a different decision is an inadequate basis for reversal on appeal."[20]

Trans Ash argues that the ALJ's order and award was not supported by substantial evidence because it was based upon Dr. Autry's medical report which, it argues, contained two errors.  The first was Dr. Autry's inaccurate

---

[16] *Hale*, 474 S.W.3d at 140 (citing *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735, 736 (Ky. App. 1984)).

[17] *Miller v. Tema Isenmann, Inc.*, 542 S.W.3d 265, 270 (Ky. 2018) (quoting *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367 (Ky. 1971)).

[18] *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 688 (Ky. 1992).

[19] *Wilkerson v. Kimball Int'l, Inc.*, 585 S.W.3d 231, 235 (Ky. 2019) (citing *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985)).

[20] *Gaines Gentry Thoroughbreds/Fayette Farms v. Mandujano*, 366 S.W.3d 456, 461 (Ky. 2012).

statement of the amount of time Mr. Papineau worked for Trans Ash. The second was Dr. Autry's alleged misunderstanding of the physical requirements of Mr. Papineau's work for Trans Ash. Trans Ash further asserts that this Court's holding in *Cepero v. Fabricated Metals Corp.*[21] compels that we vacate the ALJ's opinion and order. We disagree. We do not believe *Cepero* is applicable to the case at bar because Dr. Autry's medical report was not substantially inaccurate or largely incomplete. Further, the inaccuracies regarding the time period Mr. Papineau worked for Trans Ash were not material due to this Court's holding in *Hale, supra.*

In *Cepero*, the employee fell at work and bumped his knee against a cabinet, and was sent to CARITAS Occupational Health Center.[22] CARITAS noted that his knee was stable and not swollen, and diagnosed the employee with a "contusion and strain of the left knee."[23] A week later the employee saw Dr. Louise Box.[24] He told Dr. Box that he had broken his left knee three years ago while practicing martial arts, that he was in a wheelchair for three months due to the injury, and that surgery was recommended but never performed.[25] He did not mention the work-related injury to Dr. Box.[26] Dr. Box referred him to two orthopedic surgeons, Drs. Leonard Goddy and Thomas Loeb.[27]

---

[21] 132 S.W.3d 839 (Ky. 2004).

[22] *Id.* at 840.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

18

The employee likewise did not tell Drs. Goddy or Loeb about his work-related knee injury.[28]  He told them about the martial arts injury, but told them it happened only two and a half years prior and that he only spent two months in a wheelchair.[29]  Dr. Goddy diagnosed him with disruption of the left ACL and disruption of the left LCL.[30]  Dr. Loeb opined that the cause of the employee's present disability was caused by the martial arts accident due to the nature of the injury.[31]

Dr. David Changaris examined employee three years after the work-related injury occurred.[32]  Dr. Changaris' medical report referenced only the work-related incident and did not mention the martial arts injury.[33]  Dr. Changaris attributed the employee's knee issues entirely to the work-related incident.[34]

Dr. Ellen Ballard examined the employee two months after Dr. Changaris' examination.[35]  Dr. Ballard testified that the employee attributed his knee injury solely to the work incident and specifically denied any prior injury to his left knee.[36]  Based on that history, she initially attributed the

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 840-41.

[32] *Id.* at 841.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

19

cause of the employee's disability to the work incident.[37]  However, on cross-examination, she was shown the records of Drs. Goddy and Loeb wherein the employee's martial arts injury was discussed.[38]  After looking at those records, Dr. Ballard agreed that his disability was more likely than not caused by the martial arts accident due to the nature of the injury.[39]

The ALJ found for the employee and awarded benefits.[40]  The ALJ relied upon the medical records from CARITAS and Dr. Changaris, and Dr. Ballard's findings prior to her review of Drs. Goddy and Loeb's records.[41]  The Board reversed, holding that the ALJ's findings on causation were not supported by substantial evidence, which was later affirmed by the Court of Appeals.[42]  We agreed and held that

> where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being **substantially inaccurate** or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence.  Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable.  Furthermore, to permit a ruling of law to stand based upon such evidence that is not reliable, probative and material would be fundamentally unjust.[43]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 842.

[41] *Id.*

[42] *Id.*

[43] *Id.* (emphasis added).

The Court reasoned that Dr. Changaris did not testify and his medical report did not reference Dr. Goddy or the employee's true medical history; it referred only to Dr. Loeb's diagnosis and treatment.[44]  It therefore assumed that Dr. Changaris must have been unaware of the employee's full medical history.[45]  It further noted that Dr. Ballard was never provided the history prepared by Dr. Goddy, but only the treatment records of Dr. Loeb.[46]  The *Cepero* Court accordingly vacated the ALJ's opinion and order.

In this case, it is undisputed that Dr. Autry's report misstates Mr. Papineau's length of employment with Trans Ash.  The report provides that Mr. Papineau began working for Trans Ash in 2014 and continued working through April of 2017.  Mr. Papineau actually worked for Trans Ash from October 26, 2015, to November 20, 2015, and then from February 15, 2016, to November 1, 2016.  However, we agree with the conclusion of the ALJ and the Board that this error is not material because of this Court's holding in *Hale*.

In *Hale*, we held that when an employee alleging a work-related cumulative trauma injury had worked for multiple employers, the employer on the date of manifestation of the injury bears the full burden of paying workers' compensation benefits:

> [i]n hearing loss and occupational disease claims—which are quite similar in nature to cumulative trauma because they occur gradually over time—the employer at the time of the last injurious or hazardous exposure is liable.  The employee is entitled to the same amount of compensation whether he worked for one employer or many.  An employee who sustains a harmful change in

---

[44] *Id.* at 843.

[45] *Id.*

[46] *Id.*

21

his human organism due to cumulative trauma over many years working for the same employer is entitled to compensation to the full extent of his resultant disability. But, someone like Hale would not be fully compensated, simply because he worked for multiple employers. We can discern no basis for such a distinction … Nothing in KRS Chapter 342 limits the liability of the employer, in whose employ the date of manifestation occurred, to the percentage of the claimant's work-life spent there.[47]

The *Hale* Court based its holding on the numerous changes to Chapter 342 that had occurred since the time period when apportionment among employers was appropriate.[48] We note that there have been no changes to Chapter 342 since *Hale* was rendered that would necessitate revisiting its holding.

Therefore, it does not matter that Dr. Autry did not provide an accurate timeline of Mr. Papineau's work for Trans Ash because Dr. Autry reported that Mr. Papineau's injuries came into disabling reality during the time he worked for Trans Ash. Therefore, under *Hale*, Trans Ash bears the full burden of paying any workers' compensation benefits awarded to Mr. Papineau. In addition, Dr. Autry's mistake did not rise to the level of substantial inaccuracy that occurred in *Cepero*.

Trans Ash also asserts that Dr. Autry's report cannot be substantial evidence because it contained a "wildly inaccurate" description of Mr. Papineau's job duties and the physical demands of his job. As discussed in Section I of this opinion, Dr. Autry's report describes Mr. Papineau's job duties in three different places. Those descriptions were as follows: (1) "He had to operate levers and controls, climb up and down off of equipment, perform

---

[47] *Hale*, 474 S.W.3d at 138.

[48] *Id*. at 133-34.

maintenance and do lifting, bending and stooping activities during the course of his employment"; (2) "[t]he plaintiff's job required significant operation of heavy equipment with impact loading, climbing, operating and working in difficult positions, creating significant stress loads on both shoulders and lower back"; and (3) "[t]he job description included prolonged standing, walking, climbing, lifting, reaching, pushing, pulling, bending, stooping, crouching and overhead lifting."

As a preliminary matter, the second description is in no way inconsistent with Mr. Papineau's job duties for Trans Ash. It therefore does not warrant discussion. With regard to the first and third descriptions, Trans Ash argues that they reveal that Dr. Autry did not have an accurate understanding of Mr. Papineau's job duties because they include descriptions of performing maintenance, bending, stooping, lifting, prolonged standing, and walking. It is not disputed that Mr. Papineau's work for Trans Ash did not involve these acts. However, the ALJ found that "Dr. Autry was describing all of Papineau's prior jobs in the past that would have contributed to his cumulative trauma," i.e., all of the physical requirements his numerous jobs over the course of his thirty-five-year career entailed. Given the context in which these descriptions appear, the ALJ's interpretation of Dr. Autry's report is fair and reasonable. Additionally, the descriptions provided by Dr. Autry cannot be said to be substantially inaccurate under *Cepero* because Dr. Autry provided an accurate description of what Mr. Papineau's work as a heavy equipment operator involved.

23

Accordingly, we cannot hold that the ALJ's opinion was not based on substantial evidence, and we reverse the Court of Appeals.

### III. CONCLUSION

Based on the foregoing, we reverse the Court of Appeals and reinstate the ALJ's opinion and award.

All sitting. All concur.

COUNSEL FOR APPELLANT, Craig Papineau:

McKinnley Morgan
Morgan, Collins, Yeast, & Salyer

COUNSEL FOR APPELLEE, Trans Ash, Inc.:

Kasey Lynne Bond
Gregory Robinson
Keating, Meuthing & Klekamp, PLL

COUNSEL FOR APPELLEE, Workers' Compensation Board:

Michael Wayne Alvey

ADMINISTRATIVE LAW JUDGE:

Hon. Christina J. Hajjar