RENDERED: DECEMBER 15, 2016
TO BE PUBLISHED

**Supreme Court of Kentucky**

2015-SC-000676-WC

DATE 1/5/17 Kim Redman, DC

EDDIE'S SERVICE CENTER             APPELLANT

ON APPEAL FROM COURT OF APPEALS

V.

CASE NO. 2015-CA-000696-WC
WORKERS' COMPENSATION BOARD
NO. 10-WC-97727

DONNA THOMAS, ADMINISTRATRIX OF          APPELLEES
THE ESTATE OF EDDIE RAY THOMAS, JR.,
DECEASED; HON. STEVEN G. BOLTON,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD

**OPINION OF THE COURT BY JUSTICE KELLER**

**AFFIRMING**

An Administrative Law Judge (ALJ) dismissed the claim for workers' compensation benefits filed by the Estate of Eddie Ray Thomas, Jr. (the Estate). The Workers' Compensation Board (the Board) affirmed the ALJ's dismissal. The Court of Appeals reversed the Board and remanded this matter to the ALJ with instructions to award benefits. For the reasons set forth below, we affirm the Court of Appeals.

**I. BACKGROUND.**

On January 21, 2010, Eddie Ray Thomas, Jr. (Eddie) died while attempting to tow a truck from a roadside culvert. Because Eddie is deceased, the underlying facts, which are not in dispute, come from testimony by Eddie's

widow, Donna Thomas (Donna), and Samuel Bailey (Bailey), who was with Eddie when he died.

Donna testified that Eddie's Service Center (the Service Center) was an automobile service center and gas station owned by Eddie's father, Eddie Ray Thomas, Sr. Eddie had worked in his father's business for 30 years, spending the last 20 years as the manager. In addition to the service center/gas station, the business operated a towing service, and Eddie was "on-call" 24 hours a day.

On January 20, 2010, a representative from the Environmental Protection Agency[1] (EPA) advised Eddie that the gas tanks were leaking and would be removed the next day. According to Donna, Eddie was upset and, on January 21, when the tanks were being removed, he was inconsolable. Donna testified that Eddie feared the business would have to close if it could not sell gas, which meant he would lose his livelihood and his father's business. When Donna visited the Service Center the afternoon of January 21, Eddie was extremely anxious and agitated and could not stop pacing. That evening, Eddie was too upset to eat, appeared flushed, was sweating, and continued to pace until nearly 9:00 p.m. When it appeared Eddie had finally calmed down, he received a phone call from the Kentucky State Police asking him to tow a vehicle that had gone off the road. Donna did not hear from Eddie again and did not know anything about what transpired after Eddie left the house.

---

[1] It is unclear from the evidence whether this was the federal or state agency.

According to Donna, who is an LPN, Eddie had a history of high blood pressure, for which he took medication, and which she monitored. However, Donna testified that Eddie had never received any specific cardiac diagnostic testing or treatment and also testified that both of Eddie's parents had a history of treatment for heart conditions, including stent implantations.

The only evidence of what occurred in the hour before Eddie's death came from Bailey. According to Bailey, his son called and reported that he had been forced off the road and that his truck was in a ditch. When Bailey arrived at the scene, Eddie was there with a tow truck as was a Kentucky State Police officer. The son's truck was in a culvert, and the top of the truck was approximately four feet below the road. Eddie told Bailey that it would probably be difficult to get the truck out of the culvert without doing significant damage. However, Eddie made several attempts to do so, climbing up and down the embankment of the culvert and under the truck four times in order to re-position the tow chain. Bailey went up and down the bank with Eddie three times to help him and described the work as strenuous, noting that they had to dig their feet into the side of the embankment to get any footing. After the last trip up and down the embankment, both Eddie and Bailey were breathing hard and it took approximately five minutes for their breathing to return to normal.

Eddie told Bailey that he would need a bigger tow truck and went to his truck to call his father. The police officer, who had received another call, then left the scene. After making his call, Eddie and Bailey directed traffic for a few

minutes until Eddie began complaining of heartburn. Eddie then returned to his tow truck to call his father to see when the other tow truck would arrive. Approximately five minutes later, Bailey saw Eddie get out of the truck, heard him make a noise, and saw him grab his chest, lean against the truck, and collapse. Bailey, who believed Eddie had suffered a heart attack, began performing CPR and told his son to call for assistance. When emergency personnel arrived they continued performing CPR and transported Eddie to the hospital, where he died.

The parties filed a number of medical records and reports. Records from Morehead Clinic indicate that Eddie was diagnosed with gastroesophageal reflux disease (GERD) in 1998 and with high blood pressure in 2002. Eddie's physicians prescribed medications to treat those conditions. In 2007, Eddie complained that he was "very anxious," and "so nervous he vomits nearly daily." He noted that he had suffered from this anxiety for nearly 30 years and that taking one-fourth of a 5 mg. Valium seemed to help. The physician prescribed that dosage of Valium along with his high blood pressure and GERD medications. We note that it is unclear from these records when Eddie initially began taking Valium and who prescribed it. Furthermore, we note that the records generally indicate that Eddie's blood pressure was under control; however, the last note on December 10, 2009, shows an elevated blood pressure reading.[2]

---

[2] In addition to the preceding, the Estate filed records of Eddie's treatment at the hospital on January 21, 2010. Those records have no information of any significance to the issues before us.

Eddie filed two reports from Dr. Rodney Handshoe. In his first report, Dr. Handshoe noted Eddie's history of high blood pressure and that no autopsy had been performed. He then stated that "[s]udden cardiac death is most commonly caused by a ventricular tachyarrhythmia induced by ischemia or myocardial infarction." He noted that there could be other causes but that Eddie's commercial driver's license examination from 2008 showed no evidence of cardiovascular disease. Finally, he stated that "current medical knowledge would suggest that intense physical stress and emotional stress can indeed precipitate a cardiovascular event such as sudden cardiac death in those individuals with underlying cardiac disease. The events surrounding Mr. Thomas's death could have played a role in this regard."

Following Bailey's deposition, the Estate filed a supplemental report from Dr. Handshoe. Based on his reading of the transcript of Bailey's deposition, Dr. Handshoe noted that Eddie had "chest pain followed quickly by sudden death after a prolonged period of very intense physical activity associated with trying to extricate a wrecked vehicle." According to Dr. Handshoe, these symptoms are "typical for an acute myocardial infarction" which most commonly occurs "when there is a rupture of a preexisting atherosclerotic plaque resulting in formation of a blood clot that completely occludes an artery." The resultant "lack of blood flow to the heart muscle causes cardiac injury and can precipitate life threatening heart rhythm disturbances that likely resulted in Mr. Thomas's sudden death." Dr. Handshoe concluded "that

5

the physical exertion immediately preceding Mr. Thomas's symptoms triggered plaque rupture and precipitated his heart attack and sudden death."

The Service Center filed the report of Dr. Hal Roseman. Dr. Roseman summarized the deposition testimony of Donna and Bailey in detail. We note that Dr. Roseman's summarization is somewhat at odds with Bailey's testimony. Dr. Roseman states that Bailey testified he and Eddie "walked up and down the hill." However, Bailey stated that it was a "straight up and down" embankment, not a hill, and that they had to "dig their feet" into the side of the embankment to climb it. Dr. Roseman also states that Bailey testified, "Despite being 'winded,' [Eddie] and Mr. Bailey spoke in a normal conversational tone" after their last trip up the hill. However, the actual question and answer are as follows:

> Q: And, when he made the indication to you and your son that the larger truck was needed was he speaking in a normal tones [sic] - - normal voice at that point?
>
> A: Yes, other than winded, you know.

Dr. Roseman also summarized the medical records in detail, noting in particular Eddie's history of high blood pressure, GERD, anxiety disorder, high cholesterol, and family history of "premature coronary artery disease." Dr. Roseman then undertook a detailed analysis of research regarding the causes of sudden cardiac death. A summary of that analysis follows.

"[S]udden non-violent death . . . is usually related to coronary artery disease" and in male victims, only 50% have had any "prior known cardiovascular symptoms prior to their death." "The most common cardiac

6

abnormality associated with sudden death is ischemic heart disease, accounting for up to 80% of cases." While "ischemic heart disease sets the stage for sudden death . . . only 20% to 30% [of males] prove to have had a *recent* acute myocardial infarction." (Emphasis in original.) "The anatomic findings in the setting of sudden cardiac death involve either 'acute changes in coronary plaque morphology, such as thrombus, plaque disruption, or both, in >50% of cases of sudden death . . . active coronary lesions are identified in 46% of the cases.'" He noted that nearly half of all sudden deaths in one study were the result of "either an acute thrombus or an acute myocardial infarction." However, "an acute lesion" was found in less than 25% of those cases where the victim's symptoms had lasted "less than 15 minutes." Based on the preceding, Dr. Roseman concluded that, "in a susceptible individual . . . sudden cardiac death . . . is the general result of ischemia related to advanced atherosclerosis or structural changes of the heart from either a healed myocardial infarction or from hypertension."

Although having previously stated that Eddie's heartburn symptoms could have simply been a reoccurrence of his GERD, Dr. Roseman opined that Eddie's pre-death symptoms represented angina that was caused by "ischemia of the right coronary artery." According to Dr. Roseman, "Angina is a clinical syndrome characterized by discomfort in the chest, jaw, shoulder, back, or arm. It is typically aggravated by exertion or emotional stress and relieved by nitroglycerin." Angina occurs when there is insufficient "oxygenated blood to satisfy the metabolic and oxygen needs of a functioning heart." As to the

7

possibility of plaque rupture, Dr. Roseman stated that, "Except primarily for unconditioned individuals who undertake vigorous exercise, exercise as a trigger of an event of plaque rupture is uncertain and unproven and is considered possibly causative only when the exercise is within one hour of the cardiac event."

As to whether the work activity triggered Eddie's sudden death, Dr. Roseman stated that Eddie's activity required "minimal exertion," "was not strenuous," and "did not prevent him from talking in a normal conversational tone." According to Dr. Roseman, this put Eddie's activity at less than 4-5 on the metabolic equivalent of task (METs) scale and, regardless of the METs score, only one-third of myocardial infarctions are related to physical activity. The vast majority of those who had myocardial infarctions related to physical activity (28.6%) had engaged in moderate activity. Dr. Roseman admitted that exertion may play a role in sudden cardiac death; however, other factors, including time of day,[3] also play "an independent role."

Dr. Roseman concluded that Eddie "experienced angina that precipitated an arrhythmia. *Angina represents a symptom* related to an imbalance between oxygen demand and supply of the heart and does not represent a structural change in the artery to the heart." (Emphasis in original.) He disagreed with Dr. Handshoe's statement that Eddie had a heart attack as a result of a plaque rupture; although, he admitted that Eddie "could have had a stable plaque,

---

[3] According to Dr. Roseman, angina and myocardial infarction "occur more frequently in early morning hours upon awakening and at rest than at other times of the day."

8

plaque erosion, or plaque rupture that coincided with his sudden death." He noted that Eddie's work activities were not rigorous enough to have caused his death; the factors that lead to a plaque rupture are not known; and "exertion is an insufficient factor in effecting [that] process." After undertaking an analysis of Kentucky Revised Statute (KRS) 342.0011(1), Dr. Roseman concluded that any emotional stress Eddie had was "a chronic issue" and not "related to his occupation, but . . . appears to be intrinsic to [Eddie's] personality." Therefore, he apparently did not factor Eddie's emotional stress into his opinion regarding causation.

Finally, Dr. Roseman concluded that "the fatal arrhythmia that caused the unfortunate death of [Eddie] could have occurred at any time and [it] was merely coincidental that it took place while he was at work. The underlying conditions of his coronary artery disease most likely were present for many years, which made Mr. Thomas vulnerable to a fatal arrhythmia. There is nothing intrinsic about his work that contributed to his coronary artery disease or his fatal arrhythmia. The arrhythmia was merely a sign or symptom, albeit fatal in this situation, of [Eddie's] underlying cardiac condition."

In summary, Dr. Roseman stated that Eddie's death was not the result of an arrhythmia caused by a plaque rupture, decreased blood flow, and subsequent myocardial infarction, as stated by Dr. Handshoe. Rather, Eddie suffered from ischemia, an underlying coronary artery disease, that caused a decrease in blood flow to the heart, which caused angina, and a fatal arrhythmia. While Dr. Handshoe opined that Eddie's exertion prior to his

9

death triggered the plaque rupture and subsequent events, Dr. Roseman opined that exertion was not a causative factor.

The ALJ, relying on Dr. Roseman's report, initially determined that Eddie's death was not work-related. In doing so, the ALJ stated that he was basing his opinion solely on the medical proof. The Estate appealed to the Board and the Board reversed and remanded, noting that heart claims must be decided on the totality of the circumstances, not solely on the medical proof. On remand, the ALJ again found that Eddie's death was not work-related. In doing so, the ALJ found Dr. Roseman's opinion to be more credible than Dr. Handshoe's. In particular, the ALJ noted that Dr. Roseman undertook a more complete summary of Eddie's past medical records and of the depositions of Bailey and Donna. He also noted that Eddie's death occurred at a time "of relative inactivity" rather than when he "was engaged in the most difficult exertion," and, per Dr. Roseman, Eddie's heart attack could have occurred at any time. Finally, the ALJ found that Eddie suffered from pre-existing and active ischemic heart disease and that any anxiety regarding the removal of the gas tanks was not work-related. The Estate appealed, and the Board affirmed.

The Estate then appealed to the Court of Appeals, which reversed. In doing so, the Court found that: the ALJ failed to factor Eddie's mental stress into his conclusion; the ALJ's finding that Eddie's mental state was not work-related was "baffling"; there was no evidence to support the ALJ's finding of pre-existing active ischemic heart disease; Dr. Roseman mischaracterized Bailey's testimony regarding the amount of exertion Eddie expended, making

10

his opinion that exertion played no part in Eddie's death unreliable; and the ALJ's findings that Eddie was out of shape and engaged in unusually demanding physical exertion within an hour of his death supported Dr. Handshoe's opinion, not Dr. Roseman's. Based on the preceding, the Court determined that the ALJ could not rely on Dr. Roseman's report and remanded this matter to the ALJ for a finding in favor of the Estate.

## II. STANDARD OF REVIEW.

The ALJ has the sole discretion to determine the quality, character, and substance of the evidence and may reject any testimony and believe or disbelieve various parts of the evidence regardless of whether it comes from the same witness or the same party's total proof. *Khani v. Alliance Chiropractic*, 456 S.W.3d 802, 806-07 (Ky. 2015). If the party with the burden of proof fails to convince the ALJ, that party must establish on appeal that the evidence was so overwhelming as to compel a favorable finding. *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). In other words, an ALJ's decision should not be overturned on appeal unless it "is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law." KRS 342.285; *Ira A. Watson Department Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000).

## III. ANALYSIS.

> In any claim for compensation, where the employee has been killed, or is physically or mentally unable to testify as confirmed by competent medical evidence and where there is unrebutted prima facie evidence that indicates that the injury was work related, it shall be presumed, in the absence of substantial evidence to the contrary, that the injury was work related, that sufficient notice of the injury has been given, and that the injury or death was not

11

proximately caused by the employee's intoxication or by his willful intention to injure or kill himself or another.

KRS 342.680.

As we explained in *AK Steel Corp. v. Adkins*, 253 S.W.3d 59, 63–64 (Ky. 2008),

> A rebuttable presumption shifts to the party against whom it is directed the burden of going forward with evidence to rebut or meet it but does not shift the burden of proof (i.e., the risk of nonpersuasion) from the party upon whom the burden was originally cast. If the presumption is not rebutted, the party with the burden of proof prevails on that issue by virtue of the presumption. If the presumption is rebutted, it is reduced to a permissible inference. The ALJ must then weigh the conflicting evidence and decide which is most persuasive.

Here, the Estate offered testimony from Donna, Bailey, and Dr. Handshoe, supporting the Estate's claim that Eddie's heart attack was work-related. Thus, the Estate met its burden even without the presumption provided by KRS 342.680. However, that did not relieve the Service Center from its burden of rebutting the statutory presumption, which it attempted to do with Dr. Roseman's report. Thus, if Dr. Roseman's report is "substantial evidence," the Service Center rebutted the presumption, and the ALJ was free to weigh the evidence as in any other claim. However, if Dr. Roseman's report does not amount to substantial evidence, the presumption stands and the ALJ was required to award benefits.

Evidence is substantial if it is of "relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Smyzer v. B.F. Goodrich Chemical Co.*, 474 S.W.2d 367, 369 (Ky. 1971). Having reviewed Dr. Roseman's report, we hold that it is not substantial evidence, as delineated below.

12

## A. Misunderstanding of events.

When a physician's opinion is based on a history that is "substantially inaccurate or largely incomplete," that opinion "cannot constitute substantial evidence." *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839, 842 (Ky. 2004). Dr. Roseman's opinion that Eddie's death was not work-related is based, in large part, on his conclusion that Eddie's activity before his death required only minimal non-strenuous exertion. Dr. Roseman reached this conclusion based on his belief that Eddie walked up and down a hill several times and was able to converse in a normal tone after doing so. However, as noted above, Eddie did not "walk" up and down a hill, he climbed up and down a steep embankment and climbed under the truck several times to position and re-position the tow chain. Bailey, the only person to testify regarding the amount of exertion required, stated that the activity was strenuous - testimony that Dr. Roseman largely ignored.

As to Eddie's speech pattern, Dr. Roseman is correct that Bailey testified that Eddie spoke in a normal conversational tone. However, according to the METs chart included in Dr. Roseman's report, tone of voice is not the determinative factor regarding the intensity level of activity. Light intensity activity is marked by the ability "to talk and/or sing"; moderate intensity activity is marked by the ability "to talk but not sing"; and vigorous/hard intensity activity is marked by "difficulty talking." These categories are indicative of whether a person is out of breath rather than his tone of voice. Thus, Bailey's testimony that Eddie was "winded" after climbing up and down

13

the embankment is indicative of moderate to vigorous activity, not the minimal exertion cited by Dr. Roseman. Because this foundational leg of Dr. Roseman's opinion is substantially inaccurate and largely incomplete, his report is not substantive evidence.

## B. Failure to consider Eddie's stress.

Dr. Roseman's report also cannot be considered substantial evidence because he did not consider Eddie's heightened anxiety as a contributing factor to his death. According to Dr. Roseman, Eddie's stress was irrelevant for two reasons: it was not related to a physical injury; and it was "a chronic issue . . . not . . . related to [Eddie's] occupation, but . . . intrinsic to [his] personality." These conclusions were based on Dr. Roseman's incorrect interpretation of KRS 342.0011(1). We address each of Dr. Roseman's faulty interpretations separately below.

KRS 342.0011(1) defines injury as:

[A]ny work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings. "Injury" does not include the effects of the natural aging process, and does not include any communicable disease unless the risk of contracting the disease is increased by the nature of the employment. "Injury" when used generally, unless the context indicates otherwise, shall include an occupational disease and damage to a prosthetic appliance, but shall not include a psychological, psychiatric, or stress-related change in the human organism, unless it is a direct result of a physical injury.

As noted above, Dr. Roseman interpreted KRS 342.0011(1) as excluding any consideration of stress because Eddie's stress was not the result of a physical injury. However, as this Court held in *McCowan v. Matsushita*

14

*Appliance Co.*, 95 S.W.3d 30, 32-33 (Ky. 2002), KRS 342.0011(1) excludes compensation for "mental-mental" claims but not for "mental-physical" claims. In *McCowan,* the claimant became involved in a heated argument with a supervisor and subsequently suffered a heart attack. *Id.* at 31. The Court found that the claim was compensable because, while the trauma the claimant suffered was emotional, the harmful change for which she sought benefits was physical. *Id.* at 33. Had the claimant been seeking compensation for a purely mental condition, her claim would have been disallowed absent some physically traumatic event. *Id.*

The Estate, like the claimant in *McCowan,* filed a claim for benefits based on a physically harmful change that resulted in part from emotional trauma. Thus, contrary to Dr. Roseman's assertion, Eddie's stress is not excluded from consideration by the exclusion of mental-mental claims in KRS 342.0011(1).

It also appears that Dr. Roseman excluded any consideration of Eddie's stress because he deemed it a pre-existing active condition. This interpretation is faulty for three reasons. First, as noted above, Eddie's stress, by itself, was not compensable - whether it was active or dormant - and the Estate was not seeking compensation based on that stress. Second, Eddie's stress on the date of his death was greater than he had ever exhibited, and it is that increased stress, not the underlying always present lower-level stress, that was at issue. Third, the increased stress was the result of what was taking place at work.

Dr. Roseman's failure to consider Eddie's stress level is significant. As noted above, Dr. Roseman opined that Eddie's ischemia caused a decrease in

15

blood flow, which caused angina, which caused a fatal arrhythmia. In his report, Dr. Roseman stated that angina "is typically aggravated by exertion and emotional stress . . . ." Thus, Dr. Roseman's opinion regarding causation lacks substance because he ignored a key factor that contributed to Eddie's death.

## C. Internal inconsistencies.

Dr. Roseman's report contains a number of internal inconsistencies, which make it difficult to comprehend and which rob it of substance. Several examples of those inconsistencies follow.

Dr. Roseman initially postulated that Eddie's chest pain was the result of GERD but then stated that the pain was angina. Dr. Roseman stated, "The anatomic findings in the setting of sudden cardiac death involves either 'acute changes in coronary plaque morphology, such as thrombus, plaque disruption, or both in >50% of cases of sudden death,'" but then stated that Eddie's death could not have been the result of ruptured plaque and thrombosis. Dr. Roseman stated that "only about 6-17% of all sudden deaths occur in association with exertion," but then stated that "physical stress with vigorous exercise . . . has been shown to trigger acute cardiovascular events" and "a third of the acute myocardial infarction[s] were preceded by physical activity." Dr. Roseman stated that Eddie's death was the result of angina (chest pain due to inadequate blood flow to the heart) that triggered an arrhythmia. He then stated that Eddie's stress and exertion had nothing to do with his death and that the angina-arrhythmia could have occurred anywhere. However, as noted

16

above Dr. Roseman stated that angina "is typically aggravated by exertion or emotional stress . . . ."

Because of these inconsistencies, along with Dr. Roseman's inaccurate understanding of the facts and his misunderstanding of the law, Dr. Roseman's opinion lacks the "relevant consequence to induce conviction in the minds of reasonable men." *Smyzer*, 474 S.W.2d at 369. Therefore, his opinion is not evidence of substance and the Court of Appeals correctly reversed the Board and remanded to the ALJ for an award of benefits.

## IV. CONCLUSION.

For the foregoing reasons, we affirm the Court of Appeals. This matter is remanded to the ALJ for entry of an award in favor of the Estate.

All sitting. Cunningham, Hughes, Keller, Noble, Venters and Wright, JJ., concur. Minton, C.J., dissents by separate opinion.

MINTON, C.J. DISSENTING: Respectfully, I dissent. The Service Center argues that the Court of Appeals erred by substituting its opinion of the evidence for the ALJ's. Specifically, the Service Center argues that Dr. Roseman's medical opinion constituted substantial evidence that Eddie's death was not work related. I agree. Dr. Roseman's opinion is thorough, and the ALJ was within his discretion to rely upon it. The ALJ, as fact-finder, has the sole discretion to judge the credibility of testimony and weight of evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418 (Ky. 1985). And the Court of Appeals exceeded its appellate role by reweighing the evidence. We should reverse the Court of Appeals' decision. But instead of correcting the Court of

17

Appeals' error, the Majority magnifies it by taking an even deeper dive into the fact-finding function that belongs to the ALJ. We would do well to remember the responsibility of this Court in Workers' Compensation cases "is to address new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude." *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 688 (Ky. 1992). I dissent.

COUNSEL FOR APPELLANT:

Richard Christion Hutson
Whitlow, Roberts, Houston & Straub, PLLC

COUNSEL FOR APPELLEE:

Paula Gay Richardson
David Allen Barber
Richardson, Barber & Williamson, PSC