# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: JANUARY 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0164-WC

JENNIFER WHISMAN · · · · · · · · · · · · · · · · · · · · · · · · · · · · APPELLANT

V. · · · · · · · · · · · ON APPEAL FROM COURT OF APPEALS
· · · · · · · · · · · · · · · · · NO. 2022-CA-1318
· · · · · · · · · WORKERS' COMPENSATION NO. WC-21-00540

TOYOTA MOTOR MANUFACTURING · · · · · · · · · · · · · · APPELLEES
KENTUCKY, INC.; GREG W. HARVEY,
ADMINSTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Jennifer Whisman appeals from the opinion of the Kentucky Court of Appeals[1] which affirmed the Workers' Compensation Board (Board) opinion affirming the determination of the Administrative Law Judge (ALJ). The ALJ had determined that Whisman had failed to offer proof sufficient to show that her chronic sinusitis was the result of occupational exposer to *Pseudomonas*[2]

---

[1] *Whisman v. Toyota Motor Manufacturing Kentucky, Inc.*, 2022-CA-1318-WC, 2023 WL 2437499 (Ky. App. Mar. 10, 2023) (unpublished).

[2] *Pseudomonas* is a type of bacteria (germ) that is commonly found in the environment. It is a type of gram-negative bacteria and thrives in moist and warm environments such as commonly found in both soil and water. These bacteria can cause infections including chronic sinusitis. *See* Centers for Disease Control and Prevention, National Center for Emerging and Zoonotic Infectious Diseases (NCEZID), *Pseudomonas aeruginosa in Healthcare Settings* (Nov. 13, 2019), http://www.cdc.gov/organisms/pseudomonas.html.

bacteria as an employee at the Toyota Motor Manufacturing, Kentucky, Inc. (Toyota) plant in Georgetown, Kentucky.

Having concluded that neither the ALJ nor the Board overlooked or misconstrued controlling statutes or caselaw, or flagrantly erred in assessing the evidence so as to cause gross injustice, we affirm.

## I.  FACTUAL AND PROCEDURAL HISTORY

Whisman began working at Toyota's Georgetown plant in 2011 and testified that her sinus symptoms started in 2013, when she began experiencing dizziness.

Whisman began seeing Dr. Ronald George Shashy in July 2014. Dr. Shashy's records reflected Whisman initially reporting problems with migraine headaches, dizziness, fatigue, and facial swelling. Whisman reported she had weight gain, vision loss, eye pain, ear drainage, and hearing loss. Dr. Shashy diagnosed her with chronic sinusitis, mucus retention, chronic rhinitis, and remnants of migraine, not otherwise specified. Dr. Shashy recommended nasal irrigation with normal saline, endoscopic sinus surgery, and possibly a septoplasty. Dr. Shashy proceeded with the septoplasty surgery that August which included a partial resection of the inferior turbinate on both sides, a total ethmoidectomy on both sides, a middle meatal antrostomy on both sides, and a sphenoidotomy on both sides.  In addition to his previous diagnoses, he found Whisman to have a deviated septum. He saw Whisman again on August 26, 2014, when she presented for sinus debridement and noted Whisman had tobacco use disorder and migraines. Dr. Shashy next saw Whisman on

2

September 9, 2014, when she continued to complain of dizziness and allergic rhinitis.

Dr. Shashy's notes reported that Whisman reported a history of exposure to mold in her home but Whisman herself denied remembering making that statement and denied ever having her prior residence inspected for mold. In the later Workers' Compensation hearing, Whisman filed a report from Ray Fouser, a professional engineer, who performed testing at her then-current residence on October 27, 2020. The report indicated a sample from the master bathroom sink in her house tested negative for *Pseudomonas*.

On October 24, 2018, Whisman was seen by Dr. Leslieann Asbury of Ear, Nose, and Throat Specialists of Central Kentucky. Dr. Asbury noted Whisman's history of sinus problems and Dr. Shashy's prior surgery. At that time, Whisman's symptoms included excessive dizziness, ear pain and fullness, pain and pressure in the right cheek area, and dental pain. Whisman reported her symptoms never resolved after the previous surgery and had recently increased after moving moldy furniture. Dr. Asbury diagnosed Whisman with seasonal allergic rhinitis due to fungal spores, a history of sinus surgery, and dizziness.

Beginning in December 2019, Whisman began missing "a great deal of work" due to recurring sinus infections. She thereafter began treating with Dr. Michael Cecil, a board-certified ENT, in February 2020. Testing performed by Dr. Cecil showed the presence of *Pseudomonas* for which he prescribed numerous courses of antibiotics. Dr. Cecil performed an endoscopic revision

3

surgery on Whisman's sinuses in March 2020, in order to provide a more open ventilation path. Dr. Cecil subsequently put Whisman under anesthesia four more times to clean and irrigate her sinuses. In a January 2021 office note, Dr. Cecil diagnosed Whisman with chronic sinusitis and stated that she remained symptomatic despite normal endoscopy results. He also noted Whisman smoked a half pack of cigarettes per day.

In Whisman's Workers' Compensation claim, Dr. Cecil testified by deposition and noted that a CT-scan revealed evidence of chronic sinus infection and, during his course of treatment, *Pseudomonas* has always been present in Whisman's cultures. Dr. Cecil testified that Whisman was theoretically exposed to *Pseudomonas* at Toyota, although he did not specifically research that issue, instead relying upon Whisman's own narrative. Dr. Cecil further stated Whisman has reached maximum medical improvement (MMI) and recommended she use saline rinses and nasal steroid sprays. He testified that it was reasonable for Whisman to return to work and when he last saw her on October 25, 2021, her sinuses were normal, and her primary complaints involved unrelated shortness of breath.

Most importantly, Dr. Cecil testified that he was unsure whether *Pseudomonas* was merely present in her sinuses or was what was causing Whisman's symptoms, noting she had sinus problems for a long time.

In his deposition, Dr. Cecil was also questioned regarding an Occupational Safety and Health Administration (OSHA) report that was obtained by Whisman. At some point, Whisman contacted OSHA which had

4

tested certain machines at Toyota and found *Pseudomonas* present in a coolant used in the manufacturing process. As both the Board and Court of Appeals previously noted, the depositions of both Dr. Cecil and Dr. Owen referred to an OSHA report which was not attached to their deposition transcripts. Other than those references, there is no indication in the record that such a report was ever filed into evidence. Therefore, we cannot independently examine it.

Dr. Cecil testified that although he reviewed the OSHA report and it identified *Pseudomonas* in the plant, the report did not indicate workers' levels of exposure and he did not have the experience to know what that exposure would mean. He likewise testified he had no idea whether *Pseudomonas* in coolant within a machine would constitute a sufficient exposure to cause Whisman's condition(s).

When asked if he would say it was probable that Whisman's work was causing the growth of *Pseudomonas* in her nasal cavities, Dr. Cecil testified:

> I think that that's—I mean it's—you know, I'm not an occupational hazard physician. But if there's *Pseudomonas* in the potential air and she's getting *Pseudomonas* in her respiratory system, you know, just putting two and two together it makes sense that that could be where this is coming from.

Dr. Cecil testified that his statement regarding how Whisman contracted *Pseudomonas* was expressed within a reasonable degree of medical probability. However, later in his deposition, Dr. Cecil stated, "Maybe probable is not the right word not having known this, but I'm kind of putting two and two together so I think it's potentially a cause." He also stated, "So, you know, I think it's probably more reasonable to put 'possible.' I don't know that I'm the person to

be able to determine if it directly came from the coolant or where it came from." When asked if exposure to the coolant at Toyota caused Whisman's sinus problems, Dr. Cecil testified:

> I definitely—well—I mean I don't know about independently. I mean certainly I've operated on her before there's been purulence in her sinus cavities that grew *Pseudomonas* so that was certainly a pathogenic organism that was in her sinuses and was causing it. I don't know if that's the only cause of it, but certainly that was part of it.

In May 2020, when workers returned to Toyota following the Covid shutdown at the plant, it was believed that Whisman's *Pseudomonas* infection had been cleared and she also returned to work. However, her infection returned in June and again in September 2020. Whisman submitted an application for short-term disability in July 2020; Dr. Cecil completed a portion of that application noting Whisman had chronic sinusitis and that she was unable to work due to the, then, national Covid crisis. That application did not reflect Whisman's condition being work-related.

Whisman's last day at work for Toyota was September 11, 2020, when she went on medical leave and thereafter began receiving long-term disability benefits through her employment with Toyota. Whisman was still receiving long-term disability benefits as of the filing of this appeal. Cultures performed by Dr. Cecil in both April and June 2021, again showed growths of *Pseudomonas*.

Whisman filed her Application for Resolution of an Occupational Disease Claim (Form 102) with the Kentucky Department of Workers' Claims on April 1, 2021. She claimed her condition was caused by exposure to vapors and mists

6

at Toyota. She does not believe she can return to work at Toyota due to her dizziness, blurred vision, breathing problems, and swelling. Whisman also has varying symptoms including neck swelling, throat clearing, drainage, nose blowing, swollen lymph nodes/glands, and facial pain.

Pursuant to Kentucky Revised Statutes (KRS) 342.315, Dr. Sanford Archer, board-certified ENT with the University of Kentucky, evaluated Whisman on June 22, 2021. Dr, Archer noted that Whisman complained of migraine headaches, dizziness, atypical facial pain, and sinusitis beginning in 2013. In her evaluation, Whisman attributed all her symptoms to the work environment. Dr. Archer diagnosed Whisman with atypical facial pain, migraine headaches, no acute or chronic sinus disease, and non-otologic dizziness. He determined Whisman was not entitled to an impairment rating under the American Medical Association's *Guides to Evaluation of Permanent Impairment, 5th Edition* (AMA Guides) attributable to her complaints allegedly caused by her work environment. Dr. Archer found neither Whisman's condition, nor her complaints, were caused by her work environment and likewise determined she had no pulmonary impairment caused by the work environment and she had the physical capacity to return to her previous work, recommending no restrictions. Dr. Archer also noted Whisman had an eleven pack-year[3] smoking history and continued to smoke.

---

[3] A *pack-year* is smoking an average of one pack of cigarettes per day for one year. For example, a person could have a 10 pack-year history by smoking one pack a day for 10 years, two packs a day for 5 years, or a half-pack a day for 20 years. *See*

Dr. Archer testified by deposition and stated that while Dr. Cecil was respected in the medical community, he did not agree with everything Dr. Cecil described. Dr. Archer agreed with Dr. Cecil that sinusitis can be caused by a number of different factors and that *Pseudomonas* is a common bacteria found in many different places in our everyday environments. When Dr. Archer examined Whisman, she had no abnormal findings so there was no basis to assess an impairment rating pursuant to the AMA Guides. He noted no pathological findings were present except for those consistent with her previous surgeries, meaning some bone structure had been removed. Dr. Archer did not believe Whisman's complaints were caused by chronic sinusitis, specifically stating:

> Chronic sinusitis is classically defined as chronic infection of the sinuses that have lasted three months or longer, persisted despite medical or surgical management. It can be caused by any number of things that can block the sinuses, including allergies, mass lesions, like polyps, anatomic variance like septal deviations and abnormal turbinate structures. It can be caused by bacteria, fungus. Viral inflammation can set it up as well. And when the sinuses get blocked, they can potentially stay blocked and give that chronic nature to an acute sinus infection.

Dr. Archer additionally testified:

> [Whisman's] symptoms were pretty much out of proportion to what her findings were. She had on my examination and on Dr. Saini's previous examination two years prior complaints of atypical facial pain and neither his examination nor my examination identified any pathology on her in her sinuses. And because she's had extensive sinus surgery, we actually have the opportunity of placing scopes into the sinus, not just into the nose, to examine those areas and the scans that were referred to at the time did not

Division of Cancer Prevention and Control, Centers for Disease Control and Prevention, *Who Should be Screened for Lung Cancer* (July 31, 2023), https://www.cdc.gov/cancer/lung/basic_info/screening.htm.

show any evidence of acute or chronic sinusitis either. And so, the atypical facial pain can come from many different regions, and we recommended that she see basically a orofacial pain clinic here for further evaluation of her complaints.

At the behest of her attorney, Whisman was evaluated by Dr. James Owen in December 2021. Dr. Owen testified that Whisman had suffered from "recalcitrant *Pseudomonas*" since 2018, and her condition had worsened.

Importantly, Dr. Owen testified that her condition was caused by workplace exposure to engine coolant spray in her workplace and diagnosed chronic sinusitis exacerbated by her returns to work. He found she had reached MMI and assessed a 6% impairment rating based upon the AMA Guides. Dr. Owen also testified that Whisman had no underlying conditions prior to 2014, and that none of her impairment rating was due to pre-existing active conditions. Finally, Dr. Owen stated Whisman did not have the physical capacity to return to the type of work performed at the time of her injury.

In addition to noting a lack of a proven nexus between any *Pseudomonas* at the plant and Whisman's own injuries, Toyota noted that Whisman's sinusitis began no later than July 2014, but she did not begin working in the area of the T-2 block line (also referred to as the "machine power train line") until 2017 and, even then, no *Pseudomonas* was found in any coolant there until 2020. Thusly, Toyota argued that there was no evidence that Whisman had been exposed to *Pseudomonas* at work in 2014, when her condition began, and there was no evidence *Pseudomonas* was in any coolant in 2017, when Whisman began working in the area, or at any point prior to 2020. Finally,

9

there was no proof offered that any workers were actually exposed to the *Pseudomonus* found in the coolant system.

Following a final hearing and post-hearing briefs, the ALJ rendered his opinion on May 31, 2020, dismissing Whisman's claim on the basis that she had not submitted sufficient proof on the element of causation. Specifically, the ALJ concluded:

> There is no doubt Whisman has chronic sinusitis. The evidence on the cause of that condition is murky. It may be that Whisman was exposed to *Pseudomonas* at work but the exposure itself and any link between it and the onset of her symptoms is questionable. Dr. Archer's opinion on the question of causation is what is most important to the ALJ. He did not find a link between Whisman's alleged work-related exposure and her chronic sinusitis. In truth, the ALJ also interprets Dr. Cecil's testimony as being less than clear on the question of causation. He did not have any expertise as to the level of exposure or what would be required to cause the onset of chronic sinusitis. In light of the foregoing, the ALJ finds Whisman has failed to persuade the ALJ her chronic sinusitis is the result of occupational exposure to *Pseudomonas*. For that reason, her claim is dismissed.

Whisman petitioned the Board to reverse the ALJ's dismissal, arguing that the ALJ should not have afforded the University Evaluator, Dr. Archer, presumptive weight or relied on his opinions because they were based on an allegedly inaccurate or largely incomplete history, and therefore should have been discounted. The Board affirmed.

Whisman next appealed to the Court of Appeals arguing that the ALJ erred by relying on medical opinions which were based upon a corrupt history. Specifically, Whisman contended that Dr. Archer did not review the entirety of the medical record, was not provided with the OSHA report, and therefore could not competently provide a determination. Whisman argued that Dr.

Archer's conclusions were so flawed and corrupt they could not constitute substantial evidence and therefore could not be relied upon and should have been excluded based upon the holding in *Cepero v. Fabricated Metals Corporation*, 132 S.W.3d 839 (Ky. 2014).

The Court of Appeals affirmed and Whisman now seeks review by this Court arguing that she met her burden of proving that *Pseudomonas* "could have" independently caused her injuries and the ALJ improperly relied upon Dr. Archer's opinions.

## II. LEGAL ANALYSIS

Pursuant to KRS 342.285, the ALJ is the sole finder of fact in workers' compensation claims. As correctly noted by Whisman, this Court has read this authority to mean the ALJ has the sole discretion to determine the quality, character, weight, credibility and substance of the evidence and to draw reasonable inferences from that evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). Furthermore, the ALJ has sole discretion to decide whom and what to believe and may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977).

On review, neither the Board nor an appellate court can substitute its judgment for that of the ALJ as to the weight of evidence on questions of fact. *Shields v. Pittsburgh & Midway Coal Mining Co.*, 634 S.W.2d 440, 441 (Ky. App. 1982).

11

When, as here, the ALJ finds against the party having the burden of proof, the appellant must "show that the ALJ misapplied the law or that the evidence in [his] favor was so overwhelming that it compelled a favorable finding." *Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005). Our role is "to correct the Board *only where . . .* the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *ViWin Tech Windows & Doors, Inc. v. Ivey*, 621 S.W.3d 153, 157 (Ky. 2021) (emphasis added) (quoting *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992)).

### A. Did Whisman meet her burden of proof?

KRS 342.0011(3) states:

> An occupational disease as defined in this chapter shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident to the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause.

Whisman begins her argument by noting that KRS 342.0011(4) defines an "injurious exposure" as "that exposure to occupational hazard which would, independently of any other cause whatsoever, produce or cause the disease for which the claim is made[.]" Whisman goes on to argue that she only needed to prove that exposure *could have* independently caused her disease, citing to *Childers v. Hackney's Creek Coal Co.*, 337 S.W.2d 680, 683 (Ky. 1960), and *Letcher County Board of Education v. Hall*, 576 S.W.3d 123 (Ky. 2019). Even

12

under the standard as it is stated in *Childers* and *Hall*, this Court cannot be convinced that the ALJ was wrong in his determination.

To begin, Whisman's argument assumes that she proved actual *Pseudomonas* exposure in her workplace *and* that such exposure at work, and nowhere else, was the cause of her initial infection, later infections, or reinfections thereafter. This argument also discounts the myriad sinus issues which affected, and still affect, Whisman in addition to prior *Pseudomonas* infections. Whisman's almost intractable sinus issues contain elements of both structural, allergic, and infectious issues. None of her structural problems relate to any work injury and there was no proof that her infection-related issues (even if all such infections and resultant injuries had been proven to have been either directly caused by workplace exposure which they were not) produce[d] or cause[d] the disease independently of any other cause. KRS 342.0011(4).

Finally, even Whisman's own treating physician could not testify that the manifestations of her illness(es) were caused by *Pseudomonas* even at the times it was found in her sinuses.

Both *Childers* and *Hall*, each of which are inhalation cases like Whisman's claim, are distinguishable. In *Childers*, we reversed the Board in a silicosis case where the claimant was exposed to silica dust at work and stated the standard as follows:

> In such cases . . . this Court held that where the employee was shown to have silicosis, and had worked for a substantial period of years for the employer from whom he sought compensation,

13

*scientific proof* of the presence of silica dust in injurious quantity was not required. In the *Peabody* and *Hooks* cases the employe was engaged in the same type of work as was Childers in the instant case, namely, the operation of a mine motor car which used sand for traction purposes.

In the instant case Childers admittedly had silicosis. According to the medical testimony he had it in some degree when he began work for his last employer. However, it had not advanced to a disabling stage. He worked for his last employer for 23 months, operating the mine motor car. There was testimony that he was exposed several hours a day to dust from the sand used for traction and to rock and coal dust. At the end of the 23 months the silicosis had progressed to a disabling stage. Under these circumstances we think the board would have been entitled to find that there was injurious exposure within the meaning of the statute, without requiring scientific proof of the presence of silica dust in sufficient quantity to be capable of causing silicosis.

*Childers*, 337 S.W.2d at 683 (citations omitted).

In *Hall*, medical records indicated that the claimant was exposed to asbestos which was present in both insulation *and* floor tiles and the medical report also noted that Hall gave "a very convincing history of being exposed to asbestos while working at Letcher high school and there is an appropriate lag time." *Hall*, 576 S.W.3d at 126-27. The report concluded that asbestos containing materials at the school were causally related to Hall's condition. *Id.*

In these cases, it was readily recognized that silica dust exposure causes silicosis in humans and asbestos exposure causes mesothelioma. Neither disease is possibly caused by common allergens or bacteria found outside the workplace. Furthermore, both conditions are known presumptively as incurable and permanent. In Whisman's case it would have been unreasonable

14

for the ALJ to assume, or determine, that being exposed to *Pseudomonas* in unknown levels, at unknown times, *possibly* in the workplace, was the causative agent of each or any of the injuries of which Whisman complains.

**B.     Did the ALJ err in relying on, or being persuaded by, Dr. Archer's opinions?**

Whisman, as she has previously, contends that the ALJ should have disregarded Dr. Archer's report because he did not review all her prior medical records and failed to correctly diagnose her as suffering from chronic sinusitis, citing to *Cepero,* 132 S.W.3d at 843-44, where this Court determined that a medical opinion was ineffective as substantial evidence when the physician's opinion was based upon substantially inaccurate or a largely incomplete history. We are not persuaded by that argument here.

In *Cepero*, the ALJ ruled in favor of a claimant for an allegedly work-related knee injury based upon evidence from two doctors who indicated that his knee condition was related to a work injury. *Id.* at 842. However, neither doctor had been informed that claimant had suffered a severe knee injury several years prior. *Id.* at 842. The Board reversed the ALJ's finding that the doctors' opinions were based upon substantial evidence. *Id* at 842. This Court affirmed, quoting the Board's own holding:

> [I]n cases such as this, where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence. Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable.

15

*Id.*

We applied this same reasoning in the later opinion in *Eddie's Service Center v. Thomas*, 503 S.W.3d 881 (Ky. 2016), and held that an ALJ has the discretion to reject a medical report based on a substantially inaccurate understanding of the facts and medical history and because of several internal consistencies within the report, along with the doctor's inaccurate understanding of the facts, the report could not constitute substantial evidence. *Id.* at 887-89. "Evidence is substantial if it is of 'relevant consequence having the fitness to induce conviction in the minds of reasonable men.'" *Id.* at 887 (quoting *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971)).

In *GSI Commerce v. Thompson*, 409 S.W.3d 361 (Ky. App. 2012), the Court of Appeals held that an ALJ was not required to disregard a medical report that was "not 'unsupported by other credible evidence.'" *Id.* at 365. In that case, an employer contended that a physician's report could not be considered because it did not mention a prior relevant injury; however, the doctor explained during deposition that he was aware of the claimant's past injury. *Id.* The Court of Appeals distinguished between the facts in *GSI Commerce* and *Cepero*, stating "[i]n *Cepero*, there was a *complete omission* of a significant and clearly relevant past injury . . . the medical opinion described in *Cepero* was completely unsupported by any other credible evidence" and explained that, in *GSI Commerce*, the physician making the report was aware of

16

the prior injury and there was other evidence before the court corroborating the physician's opinion. *GSI Commerce,* 409 S.W.3d at 364-65.

The Court of Appeals was correct in this matter when it determined that the facts here most closely resemble those of *GSI Commerce.* Dr. Archer's Form 107 report showed that he had an accurate understanding of Whisman's prior medical history, even if he did not have access to all her prior medical records. He specifically indicated in the report that Whisman's sinus complaints dated back to 2013 and that she attributed those problems to her work.

Most importantly, Dr. Archer conducted his own examination of Whisman and explained in his deposition that he did not see any pathologic abnormalities *at the time* he examined her sinus cavities. While Dr. Archer did not report a diagnosis of chronic sinusitis in his report, he did conclude that while Whisman had sinusitis *at one time,* she was not actively experiencing "chronic sinusitis" *at the time of his examination,* explaining:

> [B]ecause she's had extensive sinus surgery, we actually have the opportunity of placing scopes into the sinus, not just into the nose, to examine those areas and the scans that were referred to at the time did not show any evidence of acute or chronic sinusitis either.

The operative question in this case on review has always been whether the evidence was so overwhelming that it compelled a favorable finding. Even though Dr. Cecil had previously diagnosed Whisman with chronic sinusitis, he clarified in his deposition that he was unable to conclude within a reasonable medical probability that Whisman's condition was caused by any exposure in her workplace.

17

The ALJ properly considered all the evidence, much of which cast doubt on Whisman's theory of causation. As correctly noted by the ALJ, Whisman's nasal and sinus issues predated her assignment to the machine area at Toyota and showed itself at times when she was not working in that area. Sinusitis can be caused by several different factors. *Pseudomonas* is a common bacteria found in our living environment. Dr. Cecil testified that *Pseudomonas* could cause sinusitis, but he was unable to offer an opinion on actual exposure or exposure levels such as whether bacterial levels present in any coolant could migrate into vapor and then enter an employee's sinuses in sufficient concentrations to have potentially, or independently, caused Whisman's injuries. Even Dr. Owen's report, while indicating that working at Toyota exacerbates and is "associated with" Whisman's sinusitis, does not allege that Whisman's work independently caused her issues.

## III. CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals and order of the Workers' Compensation Board are affirmed.

All sitting. All concur.

18

COUNSEL FOR APPELLANT:

Charles W. Gorham


COUNSEL FOR APPELLEE:

Kenneth J. Dietz
Lucas & Dietz, PLLC


ADMINISTRATIVE LAW JUDGE:
Hon. Greg W. Harvey


WORKERS' COMPENSATION BOARD:
Hon. Michael Wayne Alvey, Chairman